UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

CURTIS L. ROPER,                          )
                                          )
              Plaintiff,                  )
                                          )
v.                                        )        No.:   3:20-CV-439-TAV-DCP
                                          )
KNOXVILLE ASSISTED LIVING                 )
RETIREMENT COMMUNITY, LLC d/b/a           )
MANORHOUSE AT KNOXVILLE and               )
MANORHOUSE MANAGEMENT, INC.,              )
                                          )
              Defendants.                 )

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on defendants' motion for summary judgment [Doc. 74]. Plaintiff filed a response [Doc. 83], and defendants filed a reply [Doc. 90]. This matter is now ripe for adjudication. For the reasons discussed below, defendants' motion [Doc. 74] will be **DENIED**.

## I.    Background

Defendant Knoxville Assisted Living Retirement Community, LLC d/b/a Manorhouse at Knoxville ("Manorhouse") is an entity, previously owned by defendant Manorhouse Management, Inc., that operates as an assisted living and memory care facility [Doc. 75-2 p. 4; Doc. 75-3 p. 2; *see* Doc. 80 ¶¶ 2–3]. In June 2019, defendants hired plaintiff to serve as Manorhouse's laundry aide on Mondays, Wednesdays, and Fridays and van driver on Tuesdays and Thursdays [Doc. 75-2 p. 5; Doc. 75-1 p. 27; Doc. 83-1 pp. 45–46]. At plaintiff's interview, plaintiff informed his then-prospective supervisor Jamie

Akins that he suffered from a hernia [Doc. 75-1 pp. 15–16]. After being hired, plaintiff received lifting training, and was informed that he should request assistance to lift any items he considered too heavy to lift alone [Doc. 75-2 pp. 5, 38].

As a van driver, plaintiff drove Manorhouse's van to transport its residents to their various appointments and errands [Doc. 75-1 p. 18]. Manorhouse's van driver job description provides that the van driver is responsible for "[a]ssist[ing] all passengers into and out of the van," "[s]ecuring passengers with wheelchairs into seats with seatbelts," and refraining from "transport[ing] any passenger in a wheelchair" rather than "in a seat wearing a seatbelt" [Doc. 75-2 p. 50]. Defendants assert that, based on this description, plaintiff was required to lift residents from their wheelchairs into seats on the van [*Id.* at 7]. By contrast, plaintiff asserts that residents either walked onto the van or were lifted onto it in their wheelchairs via the van's mechanical lift [Doc. 83-1 p. 51]. Moreover, plaintiff suggests that wheelchair-bound residents were always transported in their wheelchairs such that he never needed to lift them, and plaintiff states he was never informed this practice was inappropriate [*Id.* at 54–56]. Additionally, plaintiff states that caregivers or others were generally available to assist if lifting had been necessary [*Id.* at 51–53; Doc. 83-2 pp. 72–74]. Defendants assert that while caregivers sometimes assisted the van driver, this was not due to any requirement of Manorhouse and therefore that the van driver needed to be able to lift residents without assistance [Doc. 75-2 p. 7]. When plaintiff was not driving on Tuesdays and Thursdays, he performed maintenance tasks and

sometimes lifted furniture and other items [*Id.* at 6]. Plaintiff suggests these lifting obligations began only after he began working at Manorhouse [Doc. 75-1 pp. 27–28].

In the laundry aide position, plaintiff was required to collect, wash, dry, fold, and put away residents' laundry and linens using Manorhouse's industrial washers and dryer [Doc. 75-2 pp. 7–8; *see id.* at 54 ]. Plaintiff used a laundry cart to transport laundry around Manorhouse [Doc. 75-1 p. 19]. Defendants aver that lifting baskets of laundry in residents' rooms, transferring washed laundry to the dryer, and moving laundry detergent containers could entail lifting over 10 pounds [Doc. 75-2 p. 8]. Defendants also state that the laundry aide needed to carry laundry up and down stairs when the elevator at Manorhouse was inoperable. Defendants recognize that other employees would occasionally help carry laundry up and down the stairs, but defendants assert this was not required [*Id.*]. Citing testimony of Manorhouse's other laundry aide, plaintiff disagrees, arguing that lifting was not necessary for the laundry aide position as the laundry aide could separate laundry into smaller loads to obviate the need to carry over 10 pounds, other employees consistently helped the laundry aide carry laundry up and down stairs, and the laundry aide never needed to lift residents [Doc. 83-9 pp. 26–28, 33–36, 38–39].

On November 13, 2019, plaintiff provided Akins with a doctor's note indicating he could not lift more than 10 pounds for medical reasons [Doc. 75-1 p. 45; Doc. 75-2 p. 58]. Defendants assert they first learned of plaintiff's lifting restriction due to his hernia at this time [Doc. 75 p. 12]; however, plaintiff asserts he also informed them of his restriction on

3

several prior occasions [Doc. 75-1 pp. 29–30]. Other managers eventually received the doctor's note, including Alicia Fields, Manorhouse's Executive Director, Elizabeth Wilkins, Manorhouse Management's Director of Human Resources, and Jim Bonnell, Manorhouse Management's Chief Operating Officer [Doc. 75-2 pp. 2, 9; Doc. 75-3 p. 5].

On November 14, 2019, Wilkins and Bonnell exchanged the following text messages:

> Bonnell: I will call you shortly. Are you aware of [plaintiff's] doctors [sic] note that says he can't lift anything over 10lbs?
>
> Wilkins: Ok. I'm actually taking a PTO day today . . . . Can I text you . . . this afternoon? I know nothing about [plaintiff] – is this a work related injury?
>
> Bonnell: That's fine. Wasn't aware you were off today. [Plaintiff] has a hernia that he's had for a while.
>
> Wilkins: Are we able to accommodate his restrictions? We don't have to as this was not work related. We should discuss.
>
> Bonnell: Agreed.

[Doc. 75-2 p. 9; Doc. 75-3 p. 11].

On November 18, 2019, Wilkins, Akins, Fields, and plaintiff met and discussed plaintiff's doctor's note and job duties [Doc. 75-2 p. 10]. Defendants suggest that at this meeting, the parties discussed plaintiff's medical condition and limitations, including his lifting restriction, the job descriptions for the van driver and laundry aide positions, the requirements of every other position, and the need for defendants to keep their residents safe [*Id.* at 10–13]. However, plaintiff suggests that defendants simply showed him his job descriptions, made him sign them, and terminated him [Doc. 75-1 pp. 47–51]. Plaintiff

claims not to have seen the job descriptions prior to this day [*Id.* at 50]. Plaintiff also avers he offered to serve as a laundry aide or in the receptionist position—which plaintiff alleged was available at the time—until after he had hernia surgery and that defendants rejected these proposals [*Id.* at 48]. Plaintiff suggests that the managers never mentioned his inability to lift at least 10 pounds [*Id.* at 50–51].

Ultimately, defendants terminated plaintiff at the meeting "due to the fact that he could not perform the essential functions of any position for which he was qualified . . . ." [Doc. 75-2 p. 14]. Defendants claim they considered that plaintiff's restriction prevented him from lifting residents onto the van and laundry as needed and were concerned that plaintiff could have injured himself or others while working [*Id.* at 11, 13]. Defendants aver they relied on Fields's training as a nurse, Wilkins's training in human resources, and the managers' experience with plaintiff [*Id.* at 12].

Ultimately, plaintiff filed this action, which asserts claims under the Americans with Disabilities Act ("ADA"), the Tennessee Human Rights Act ("THRA"); and the Tennessee Disability Act ("TDA") for retaliation, discrimination, and failure to participate in the interactive process and offer reasonable accommodations [Doc. 80 ¶¶ 18–21]. Defendants' instant motion seeks summary judgment as to all of plaintiff's claims [Doc. 74].[1]

---

[1] While defendants offer no specific argument as to plaintiff's THRA disability claim, the Court notes the analysis of disability claims under the ADA and the THRA are the same. *Barrow v. Cato Corp.*, No. 3:04-CV-206, 2006 WL 13216, at *2 n.2 (E.D. Tenn. Jan. 3, 2006). Thus, if the Court considered defendants' arguments as to plaintiff's THRA disability claim, the Court would not dismiss that claim for the reasons discussed *infra*.

## II. Analysis

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the court must draw "all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). The moving party bears the burden of establishing that no genuine issues of material fact exist and may meet this burden by affirmatively proving its case or by highlighting the absence of support for the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).

"Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis v. Universal Match Corp., Inc.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991). To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record, including depositions, documents, affidavits, and other materials, upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *see also* Fed. R. Civ. P. 56(c)(1)(A). There must be more than a "mere scintilla of evidence" to withstand a motion for summary judgment. *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007). And any genuine issue of fact must be material; that is, it must involve "facts that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

6

The court may not weigh the evidence or assess credibility; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the nonmovant. *Id.* at 249. If a reasonable juror could not find for the nonmovant, the court must grant summary judgment. *See Celotex*, 477 U.S. at 323.

### A. ADA Claims

The ADA prohibits discrimination against a "qualified individual on the basis of disability . . . ." *See* 42 U.S.C. § 12112(a). A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . . ." *Id.* § 12111(8). ADA discrimination includes discharging employees and "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability[,] . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of" the employer's business. *Id.* § 12112(a), (b)(5)(A).

### 1. Reasonable Accommodation Claim

Courts analyze reasonable accommodation ADA claims under the "direct evidence" standard. *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 416–17 (6th Cir. 2020). Under this standard, the plaintiff must show: "(1) that he is disabled, and (2) that he is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Id.* at 417. If the plaintiff satisfies its burden, the defendant must show "that a challenged job criterion is essential, and therefore a business

7

necessity, or that a proposed accommodation will impose an undue hardship upon" the defendant. *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 417–18 (6th Cir. 2021).

### a.     Known Disability

Defendants argue that plaintiff was not "disabled" under the ADA until November 13, 2019, because they had no reason to know of his lifting restriction before that date [Doc. 75 p. 12]. An employer can be liable for discrimination only if the employer knew of the plaintiff's disability at the relevant time. *See Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) (citation omitted).

As a preliminary matter, whether defendants knew of plaintiff's disability before November 13, 2019 is not central to plaintiff's claims since those claims derive from defendants' actions after he provided defendants with his doctor's note on November 13, 2019 [Doc. 80 ¶¶ 18–21]. Regardless, there is a dispute of fact as to whether defendants actually knew of plaintiff's disability before that day. While plaintiff worked without a formal lifting restriction until November 13, 2019, plaintiff's evidence suggests he informed his supervisors of his hernia and lifting restriction before that day [Doc. 83-1 pp. 62–63, Doc. 83-3 pp. 201–02]. Consequently, there is a dispute of fact as to whether defendants knew or should have known of plaintiff's disability sooner.[2]

---

[2] Without developing the argument, defendants suggest that plaintiff's condition was not a "disability" under the ADA [Doc. 75 pp. 12–13]. A "disability" is a "physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). Working and lifting are "major life activities." 29 C.F.R. § 1630.2(i)(1)(i). "'An impairment need not prevent, or significantly or severely restrict . . . a major life activity' to be substantially limiting," and the term "substantially limits" should be construed broadly. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853–54 (6th Cir. 2018) (omission in original) (citations omitted).

8

### b.    Otherwise Qualified

Defendants next argue that plaintiff was not "otherwise qualified" for his positions. Pertinently, defendants argue that: (1) the ability to lift 10 pounds was an essential function of every position at Manorhouse that plaintiff could not perform; and (2) plaintiff's disability caused him to pose a "direct threat" to himself and others [Doc. 75 pp. 13–22].

### i.    Essential Function

Defendants argue plaintiff was not qualified for his positions or any other positions because lifting at least 10 pounds was an essential function of all positions [Doc. 75 pp. 13–19].  An employee is "otherwise qualified" for a position only if "she can perform the essential functions of [the] job with or without an accommodation."  *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018).  Essential functions of a job are not "marginal" job duties; rather, they are "core" functions, the removal of which "would fundamentally alter the position."  *Id.* (citations omitted).  To determine whether a function is essential, courts should consider "the actual functioning and circumstances" of the position in light of various factors, including: (1) the amount of time the employee spends performing the function; (2) the employer's judgment; (3) written job descriptions created prior to interviewing the employee; (4) the consequences of not requiring the employee to

---

There is ample evidence that plaintiff was disabled.  Defendants do not seem to dispute that plaintiff's hernia was a "physical impairment" [*See* Doc. 75 p. 12].  *See also Schmidt v. Town of Cheverly*, 212 F. Supp. 3d 573, 581 (D. Md. 2016) (collecting cases finding that hernias qualify as ADA disabilities).  And there is a dispute of fact as to whether plaintiff's hernia substantially limited his major life activities because lifting is a major life activity and plaintiff's evidence suggests his hernia prevented him from lifting over 10 pounds [Doc. 83-1 pp. 40, 62–63, Doc. 83-6 p. 2].  *See* 29 C.F.R. § 1630.2(i)(1)(i).

9

perform the function; and (5) the work experiences of other persons in similar positions. 29 C.F.R. § 1630.2(n)(3); *Henschel v. Clare Cnty. Rd. Comm'n*, 737 F.3d 1017, 1023 (6th Cir. 2013). The inquiry of whether a function is essential is "highly fact specific" and generally "not suitable for resolution through a motion for judgment as a matter of law." *Hostettler*, 895 F.3d at 854; *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 859 (6th Cir. 1998).

The Court finds a dispute of fact exists as to whether the ability to lift over 10 pounds was an essential function of plaintiff's positions and all other positions. True, some evidence suggests that lifting at least 10 pounds was an essential function. For example, some evidence suggests plaintiff often lifted residents, furniture, and laundry [Doc. 83-1 pp. 55, 173, 182]. Additionally, defendants' managers consider lifting to have been essential to all positions [Doc. 83-12 p. 1; Doc. 83-13 p. 7]. Moreover, severe consequences may have followed if plaintiff could not have lifted a resident in an emergency situation [Doc. 83-12 p. 1; Doc. 83-13 pp. 7–9].

But other evidence may suggest lifting at least 10 pounds was not essential. First, the amount of time plaintiff spent lifting suggests lifting was not essential. As to the van driver position, there is evidence that residents generally walked onto the van or were lifted by the van's mechanical lift [Doc. 83-1 p. 51]. And if a resident needed to be personally lifted, a caregiver or other employee was or could have been available to assist [*Id.*; Doc. 83-2 pp. 72–74; *see also* Doc. 83-10 p. 4 ("Staff members should never perform a transfer with a resident that may be too heavy without asking for assistance.")]. As to

10

the laundry aide position, plaintiff did not necessarily need to lift over 10 pounds as he could divide laundry into smaller loads [Doc. 83-9 pp. 26–28].

Moreover, the written job descriptions do not show that plaintiff needed to lift over 10 pounds. The van driver description states that van drivers must "[a]ssist all passengers into and out of the van" and "[s]ecure passengers with wheelchairs into seats with seatbelts" [Doc. 83-5 p. 2]. While this description might suggest the van driver needed to lift wheelchair-bound residents into seats, the description does not specifically indicate that the van driver needed to assist residents by lifting them. Indeed, practice suggests lifting was not required as plaintiff states he never lifted residents due to the availability of assistance, the van's lift, and the fact that wheelchair-bound residents rode in their wheelchairs [Doc. 83-1 pp. 51, 55–56; Doc. 83-2 pp. 72–74]. Similarly, the laundry aide description provides that the laundry aide's primary responsibility is to "[w]ash, dry, fold and put away resident clothes," linens, and towels [Doc. 83-4 p. 2]. This description did not require plaintiff to lift over 10 pounds as he could lift fewer clothes at a time [Doc. 83-9 pp. 26–28].[3]

Further, the work experience of the other laundry aide suggests that lifting more than 10 pounds was not essential. The other laundry aide never needed to lift anything she considered to be "too heavy," and when the elevator was occasionally inoperable, others

_____

[3] Additionally, plaintiff may have only viewed and signed these descriptions when he was terminated [Doc. 75-1 pp. 47, 50]. *See* 29 C.F.R. § 1630.2(n)(3)(ii) (noting that "descriptions prepared before . . . interviewing applicants" is evidence as to whether a job function is essential).

11

assisted her [*Id.* at 33–35, 38–39].  Moreover, she claims she never needed to lift residents because that responsibility belonged to other employees [*Id.* at 35–36].

Relying on *Brickers*, 145 F.3d 846, defendants argue the consequences of not requiring every person at Manorhouse to lift at least 10 pounds could have been severe because falling residents could have injured themselves and defendants could have been subject to Tennessee penalties for failure to provide "protective care," and be ready "to intervene if crises arise" [Doc. 75 pp. 16–19 (quoting Tenn. Comp. R. & Regs. 1200-08-25-.07(7)(a) (2018))].  In *Brickers*, the plaintiff was a bus driver who suffered from a disability that prevented her from lifting and serving as a bus driver, so she requested a transfer to the position of bus attendant.  145 F.3d at 848.  Bus attendants supervised and assisted handicapped students on special education buses.  *Id.*  After considering the plaintiff's transfer request, the school board terminated her, and she sued.  *Id.*  At trial, the court granted judgment as a matter of law to the school board, finding that lifting was an essential function of the bus attendant position.  *Id.*  The Sixth Circuit affirmed the court's decision, highlighting that the school board could have faced penalties for transferring the plaintiff because Ohio law required that bus attendants be able to "appropriately lift[] and manag[e] handicapped pupils when necessary."  *Id.* at 849–50.

This case is distinguishable from *Brickers*.  In *Brickers*, Ohio law specifically required bus attendants to be able to lift handicapped pupils.  *Id.*  But Tennessee regulations impose no specific lifting requirement on every assisted-care living facility van driver.  *See* Tenn. Comp. R. & Regs. 1200-08-25-.07(7)(a).  Moreover, there is evidence that plaintiff

12

could have received assistance as needed, so, unlike in *Brickers*, it is not necessarily true that defendants would have failed to provide sufficient care if they retained plaintiff.[4]

Finally, the Court considers that defendants previously accommodated other employees when they had lifting restrictions. For example, defendants placed one caregiver on receptionist duty after she suffered a vehicle accident and another caregiver on "light duty" when she injured her back lifting a resident [Doc. 83-2 pp. 76–77; Doc. 83-3 pp. 102–03; *see* Doc. 83-16 p. 222 (stating that the phrase "light duty" generally refers to lifting restrictions)]. These prior accommodations create a dispute of fact as to whether "the actual functioning" of Manorhouse was such that it was essential for every employee to be able to lift residents. *Henschel*, 737 F.3d at 1023.[5] In sum, reasonable jurors may conclude that lifting over 10 pounds was not essential to plaintiff's positions or all other positions at Manorhouse.

## ii.    Direct Threat

Defendants argue plaintiff was not qualified for any position because defendants' managers properly determined plaintiff was a "direct threat" to defendants' residents

---

[4] Defendants also cite *Swann v. Washtenaw Cnty.*, 221 F. Supp. 3d 936 (E.D. Mich. 2016), and *Proctor v. N. Lakes Cmty. Mental Health Auth.*, No. 1:11-CV-162, 2012 WL 3637605 (E.D. Mich. June 1, 2012). These cases are not binding on this Court and are in any event distinguishable. *Swann* is distinguishable because "[t]he core purpose" of the plaintiff's position was to provide care, the written job description referenced lifting, and the plaintiff herself recognized that lifting was essential. *See* 221 F. Supp. 3d at 941–42. *Proctor* is distinguishable for similar reasons. *See* 2012 WL 3637605, at 1–2; *id.* at 9.

[5] Defendants argue these prior examples are irrelevant because the employees were involved in workers' compensation claims [Doc. 90 pp. 7–8]. But regardless of the claim at issue, these prior accommodations could exemplify defendants' judgment that not every employee needed to be able to lift residents at any time.

[Doc. 75 pp. 19–20; Doc. 90 pp. 10–12].[6]  A person is not qualified for his position if he presents to others a "direct threat," that is, "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."  *Michael v. City of Troy Police Dep't*, 808 F.3d 304, 307 (6th Cir. 2015) (quoting 42 U.S.C. § 12111(3)).  When a direct threat challenge is presented, the court must consider whether the employer reasonably determined that the plaintiff presented a direct threat based on an "individual assessment" of the plaintiff's ability to perform the essential functions of his positions.  *Leppek v. Ford Motor Co.*, No. 18-13801, 2021 WL 1720839, at *9 (E.D. Mich. Apr. 30, 2021) (quoting 29 C.F.R. § 1630.2(r)).  When conducting this individualized assessment, the employer should consider: "(1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm."  *Id.* (quoting 29 C.F.R. § 1630.2(r)).

"[W]hether an employer properly determined that a person poses a direct threat . . . depends on 'the objective reasonableness of [the employer's] actions.'" *Michael*, 808 F.3d at 307 (alteration in original).  An employer's determination is reasonable if based on an objectively-reasonable medical opinion or testimony regarding the employee's behavior.  *Id.*  "After determining the sufficiency of an employer's termination procedures," the court must also consider whether the plaintiff in fact posed a

---

[6]  Defendants argue the Court cannot consider certain testimony on this issue [Doc. 90 pp. 10, 10–11 n. 5].  The Court does not address this argument because the Court does not rely on the challenged testimony.

14

direct threat. *See Hoback v. City of Chattanooga*, No. 1:10-CV-74, 2012 WL 3834828, at *8 (E.D. Tenn. Sept. 4, 2012).

The Court finds a dispute of fact exists as to whether defendants properly determined that plaintiff presented a direct threat. Text messages between Wilkins and Bonnell suggest they may have decided to terminate plaintiff even before Wilkins knew the details of or could make an individualized assessment of plaintiff's condition in light of the relevant factors [Doc. 83-16 p. 346]. *See Leppek*, 2021 WL 1720839, at *9. Defendants argue they followed appropriate procedures [Doc. 75-2 pp. 12–13], but it is not the Court's role to weigh the evidence. *See Anderson*, 477 U.S. at 249. To the extent defendants argue plaintiff in fact presented a direct threat to himself and others, the Court finds a dispute of fact exists because there is a dispute as to whether lifting residents was even essential to plaintiff's positions. *See supra* Part II.A.1.b.i. Therefore, the Court will deny defendants' motion as to plaintiff's reasonable accommodation claim.[7]

### 2. Interactive Process Claim

Defendants briefly argue plaintiff's interactive process claim must be dismissed [Doc. 75 p. 22]. The ADA requires "an employer 'to initiate an informal, interactive process' when necessary to determine how an employee's disability limits [his] ability to

---

[7] As noted, plaintiff must show that he was qualified for his position with or without proposed reasonable accommodations. *See Fisher*, 951 F.3d at 417. Because there is a dispute of fact as to whether lifting at least 10 pounds was essential to plaintiff's positions, plaintiff may have been qualified for his positions even without accommodations. Therefore, defendants have not demonstrated they are entitled to summary judgment as to plaintiff's reasonable accommodation claim, and the Court need not address the parties' contentions regarding reasonable accommodations [Doc. 75 pp. 20–22].

15

work and to identify appropriate reasonable accommodations." *Arndt v. Ford Motor Co.*, 716 F. App'x 519, 528 (6th Cir. 2017) (alteration in original). The failure to engage in this process is actionable, however, only if the plaintiff demonstrates he could have performed the essential functions of his positions with a reasonable accommodation. *Id.* Both parties must exercise good faith when participating in the interactive process, and if either party does not do so, courts should "isolate the cause of the breakdown and then assign responsibility." *Fisher*, 951 F.3d at 421. Notably, an employer does not exercise good faith if it decides the accommodations it is willing to offer before even meeting with the employee. *Id.*

The Court finds defendants have failed to demonstrate they are entitled to summary judgment as to plaintiff's interactive process claim. First, defendants argue that "[i]t is undisputed that [defendants] engaged in the interactive process . . . ." [Doc. 75 p. 22]. This conclusory, unsupported assertion does not establish that defendants are entitled to summary judgment. Second, defendants argue plaintiff did not propose any reasonable accommodations because all proposed accommodations would have inappropriately eliminated the essential requirement that plaintiff be able to lift over 10 pounds [*Id.* at 20–22]. The Court rejects this argument because there is a dispute of fact as to whether the ability to lift over 10 pounds was even essential. *See supra* Part II.A.1.b.i. Moreover, there is a dispute of fact as to whether defendants engaged in good faith in the interactive process because Wilkins's and Bonnell's text messages suggest they may have "determine[d] the accommodations [defendants would] offer before meeting with" plaintiff

16

[Doc. 83-16 p. 346]. *Fisher*, 951 F.3d at 421 (citation omitted). Therefore, the Court will deny defendants' motion as to plaintiff's interactive process claim.

### 3.    Discrimination-by-termination and Retaliation Claims

Defendants argue plaintiff's discrimination-by-termination and retaliation claims must be dismissed because plaintiff cannot demonstrate he is "otherwise qualified" for his positions and, in any event, defendants terminated plaintiff for a legitimate reason in light of the risks plaintiff presented to defendants' residents [Doc. 75 pp. 22–24; Doc. 90 pp. 15–17]. As a preliminary matter, the parties dispute the framework under which the Court should resolve defendants' challenge as to these claims. Plaintiff argues the Court should utilize the direct evidence framework [Doc. 83 p. 24] while defendants argue the Court should utilize the *McDonnell-Douglas*[8] framework [Doc. 75 pp. 22–24]. The Court need not definitively determine which framework applies because under either framework, defendants are not entitled to summary judgment.

First, assuming the direct evidence framework applies, the plaintiff must provide "direct evidence of discrimination, including evidence that the employer relied upon the plaintiff's disability in making its employment decision." *Bent-Crumbley v. Brennan*, 799 F. App'x 342, 345 (6th Cir. 2020). "A plaintiff can establish a prima facie case under the direct evidence framework by bringing evidence of discriminatory intent, such as a facially discriminatory employment policy or express statements of desires to remove

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

17

employees." *Id*.  To the extent the text messages between Wilkins and Bonnell constitute direct evidence of discrimination and retaliation, they raise a dispute of fact as to whether defendants terminated and retaliated against plaintiff based on his disability because they suggest that Wilkins and Bonnell terminated plaintiff based on his hernia and corresponding doctor's note [Doc. 83-16 p. 346].

Alternatively, assuming the *McDonnell-Douglas* framework applies, as to a termination claim, the plaintiff must demonstrate: "(1) that she or he is an individual with a disability[;] (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) who was discriminated against [i.e., suffered an 'adverse employment action'] solely because of the disability." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008).  And as to a retaliation claim, the plaintiff must show that: (1) he "engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against" the plaintiff; and (4) the plaintiff's protected activity was a "but-for cause" of the adverse action.  *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015); *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).  Assuming the plaintiff satisfies the applicable burden as to each claim, the defendant must "'articulate some legitimate, nondiscriminatory reason' for its actions" as to each claim.  *Talley*, 542 F.3d at 1105.  If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the defendant's articulated reason "is a pretext for discrimination." *Id.*  A

plaintiff can demonstrate that a proffered explanation is pretextual by showing that it has "no basis in fact" or that it "did not actually motivate the employer's action." *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

As to plaintiff's termination claim, as discussed, there is a dispute of fact as to whether plaintiff was qualified for his positions and whether he was terminated as a result of his disability. And as to plaintiff's retaliation claim, the text messages between Wilkins and Bonnell create a dispute of fact as to whether defendants terminated plaintiff because he informed defendants of his hernia and lifting restriction [Doc. 83-16 p. 346].

Assuming defendants' articulated reason for plaintiff's termination—that plaintiff posed a threat to defendants' residents' safety—is sufficient, the Court also finds a dispute of fact exists as to whether this explanation is pretextual. First, there is a dispute of fact as to whether defendants' "proffered reason[] had [any] basis in fact" given the Court's direct-threat and essential-function analyses. *Chen*, 580 F.3d at 400. Moreover, there is a dispute of fact as to whether defendants' proffered reason "actually motivate[d]" their decision to terminate plaintiff in light of the text messages, which suggest defendants may have decided to terminate plaintiff before considering whether he was a threat to defendants' residents [Doc. 83-16 p. 346]. *Chen*, 580 F.3d at 400. Defendants argue these messages had a different meaning [Doc. 90 pp. 15–16], but it is not the Court's role to weigh the evidence. *See Anderson*, 477 U.S. at 249. Therefore, the Court will deny defendants' motion as to these claims.

## B.     TDA Claims

Finally, defendants move to dismiss plaintiff's TDA claims [Doc. 75 p. 24].  The ADA and TDA are identical except in one respect: the TDA does not require an employer to make reasonable accommodations so that an employee can perform essential job functions.  *See Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 nn.2 & 3 (6th Cir. 2013); *see also Berry v. SAGE Dining Servs.*, No. 3:19-CV-830, 2021 WL 3037483, at *14 (M.D. Tenn. July 19, 2021) (collecting discrimination and retaliation cases applying ADA and TDA requirements conterminously).  In other words, the only distinction is that under the TDA, courts will not find disability discrimination if the employee's disability precluded him from exercising essential job functions.  *Oliver v. Titlemax*, 149 F. Supp. 3d 857, 866 (E.D. Tenn. 2016).

As discussed, there is a dispute of fact as to whether the ability to lift at least 10 pounds was an essential function of the positions at Manorhouse.  Therefore, the Court cannot determine whether plaintiff's disability prevented him from exercising the essential functions of his positions even without reasonable accommodations.  Consequently, for the same reasons the Court will deny defendants' motion as to plaintiff's ADA claims, the Court will also deny defendants' motion as to plaintiff's TDA claims.[9]

---

[9]     Defendants' memorandum suggests the Court should dismiss with prejudice sex discrimination claims that plaintiff asserted in prior iterations of the complaint [Doc. 75 pp. 2 n.1, 24–25; *see* Docs. 8, 22].  However, after filing their memorandum, defendants stated they did not oppose plaintiff's then-pending motion to amend the complaint to exclude the sex discrimination claims [Doc. 77].  And, since defendants filed their memorandum, the Court granted plaintiff's motion to amend [Doc. 79], and therefore, there are no longer any sex discrimination claims before the Court.  *See Lopez v. Todd Greiner Farms Packing, LLC*, No. 1:21-CV-227, 2021 WL 5628811, at *1 (W.D. Mich. Aug. 26, 2021).  Therefore, defendants' request is moot.

20

### III. Conclusion

For the foregoing reasons, defendants' motion for summary judgment [Doc. 74] is **DENIED**.

Additionally, the Court is of the opinion that ordering this case to mediation at this time will promote judicial economy and facilitate a possible resolution in this action. Accordingly, pursuant to Local Rule 16.4, the Court hereby **ORDERS** the parties to mediate this action in good faith within **ninety (90) days** of the entry of this Order. *See* E.D. Tenn. L.R. 16.4(a) ("With or without the agreement of the parties in any civil action, except those exempted pursuant to Local Rule 16.3, the Court may refer all or part of the underlying dispute to Mediation pursuant to this Local Rule."). Within **seven (7) days** following the conclusion of mediation, the mediator shall **FILE** a report with the Court stating the outcome of the mediation as contemplated by Local Rule 16.4(m).

In light of the order of mediation, the trial and final pretrial conference scheduled for October 11, 2022, and October 4, 2022, respectively, are hereby **CANCELLED**, and this action is **STAYED**. If the parties are unable to resolve this action pursuant to mediation, the Court will lift the stay after the mediator files his or her report stating the outcome of the mediation.

Accordingly, the outstanding motions in limine [Docs. 63, 84] are hereby **DENIED** with leave to refile.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE